141 So. 713

## FRENCH v. STATE.

### 4 Div. 798.

Court of Appeals of Alabama.

Jan. 19, 1932.

Rehearing Denied March 22, 1932.

Sollie & Sollie, of Ozark, for appellant.

Thos. E. Knight, Jr., Atty. Gen., and Thos. Seay Lawson, Asst. Atty. Gen., for the State.

SAMFORD, J.

The defendant, while under the influence of whisky, killed his own son, by shooting him with a gun. The indictment was for murder in the first degree and the defenses were not guilty, self-defense, and insanity. There was also evidence tending to prove a drunken condition of defendant at the time of the homicide, which rendered the defendant incapable of a formed design to take life. The jury evidently accepted the latter theory and returned a verdict of guilty of manslaughter in the first degree and fixed his punishment at ten years in the penitentiary.

On the trial the state examined one Bartow Mattox who testified to the following state of facts:

"I saw Mr. French that morning before the shooting. I also saw Walter French, he came out of the field where I was plowing. The first time I saw Walter he was between the house and the barn. Just a short time before the shooting I heard Mr. French say 'He says my boy you had just as well come on now and bring my money.' At that time Mr. French was in the south corner of his yard and the boy was going down the road. I never saw the boy at that time. I did see them together before that.

"The first I knew of any of it, I went to the barn to catch my mule and I heard a row or fuss in the house and I went to the porch and was putting the harness on my mule, the harness lay on his porch. I heard his father tell him 'I give you until sun up to get my money or I am going to shoot you.' Both of them were then inside the house but I did not see anybody but Mr. French and I saw him through the window. He picked up a gun and I took my mule and went on to the field. The sun was just beginning to rise, you could see the edge of it. I went to plowing and the boy came out there. The boy then went back there to the house and I saw them again out

there close to the crib and Minnefield Newsom was up there and Mr. French went and put his gun back up in the house. He did not bring the gun out until Minnefield left, but he then came back out of the house with the gun. At that time Walter was out close to the crib and came to the edge of the porch. Minnefield came up there again and defendant went back in the house with his gun and it wasn't long after Minnefield left before the boy went down the road. The boy left the house and went down the road and that is when Mr. French come out in the yard and made the remark for him to come on there. He said 'all right, my boy, you had just as well come on home. I done told you I give you until sun up to get my money and if you don't come on I'll hunt you up like a rabbit and I'll shoot you down where I find you.'" The defendant had his gun with him at that time and was going in the direction of the boy. "Something like fifteen or twenty minutes he came back up the road and sat down by his front door and laid his gun across his lap, and in something like I reckon fifteen or twenty minutes later than that the boy came back up the road and walked in at the front door by him, and I seen him in the back of the house at the crib and then he turned back to the kitchen. He turned back there and in a minute or two I heard the gun fire."

Upon defendant being examined as a witness in his own behalf, he offered to prove: "(1) That Mr. French, defendant, had $52.50 in his pocket; (2) that he got under the influence of liquor and forgot where he was and didn't wake up until the next morning; (3) that when he woke up his money was gone; (4) that his son (Walter French), at first denied having the money, but finally handed back to defendant $20.00 of it and said: 'You are lucky that I got this much of it, and did not give defendant the balance'; (5) that defendant went to the dining room door to ask his son for the balance of that money, the difference between the money he had when he went to bed the night before and the $20.00 his son had handed back to him. Counsel for defendant insisted before the court that said matters were each separately and all of them together explanatory of defendant's presence and of his asking for the money." The court refused to allow this testimony, and the defendant excepted. The facts sought to be proved were not a part of the res gestæ; were details of prior transactions and not related to statements testified to by the witness Mattox. As to (5) the defendant will not be allowed to testify to his intention or to make evidence for himself.

Upon this point the court instructed the jury as follows:

"You are not concerned with statements as to whether or not there was a robbery committed on the night before in the home or somewhere about the premises of defendant.

"All I allow to go to you in that connection is what was said by the defendant and what the witness for the state undertakes to say was said with regard to a threat.

"As to whether or not the money was actually stolen the night before is not for your consideration."

These excerpts clearly state the law regarding this question. Hurst v. State, 21 Ala. App. 313, 108 So. 77; Bluett v. State, 151 Ala. 41, 44 So. 84; Eden v. State, 24 Ala. App. 37, 129 So. 797.

■ Appellant cites numerous authorities holding that, where one party to a suit has brought out a part of a conversation, the adverse party is entitled to bring out the whole conversation, if he so desires, but this rule does not apply to particulars of former transactions not constituting a part of the res gestæ, or tending to shed light on the issues. The above rule is fully stated in Gary v. State, 18 Ala. App. 367, 92 So. 533. There was no exclusion by the court of what deceased said at the time of the difficulty. That evidence was admitted without objection.

■ There was no error in refusing to give, at defendant's request, written charge, which for convenience we have marked (1). This charge fails to hypothesize an act of violence, on the part of defendant, from which ordinarily, in the usual course of events, death or great bodily harm might result. Reynolds v. State, 154 Ala. 14, 45 So. 894.

■ Refused charges 2, 3, 15, and 21 were covered by the court in its general charge. Moreover, charge 21 is argumentative, involved, and misleading. •

The refused charges requested by defendant referring to the plea of insanity were all fully covered by the court in its able and lucid charges on this question. In this charge the jury was fully instructed as to every right to which the defendant was entitled under such a plea.

■ The normal sexual relations between defendant and his wife growing out of the fact that he was thirty-one years her senior are immaterial to any issue in this case, and such evidence was properly excluded.

The court has read and considered this entire record and noted the novel questions presented. The defendant has had a fair and impartial trial, such as the law contemplates, free from prejudicial error, and the judgment is affirmed.

Affirmed.

## On Rehearing.

The ruling of the court in excluding testimony offered by defendant is referable only to that testimony designated in the original opinion as (1), (2), (3), (4), (5), and does not refer to the testimony of defendant as to what was said by him and the deceased at the time of the fatal shooting. The defendant in testifying was allowed, without objection, to testify as to everything said and done by himself and deceased just prior to and at the time of the difficulty, wherein defendant killed his son. Appellant's counsel have cited numbers of cases supporting the contention that statements of parties to a difficulty which are a part of the res gestæ or relate thereto shedding light on the transaction are admissible in evidence. These statements were allowed in this case. But the fact, if it be a fact, that the son had taken some money from the father on the night preceding, would not authorize the father to kill the son or to approach him with a gun for the purpose of demanding its return.

■■ Appellant's counsel devotes much of his brief to a discussion of the following charge refused by the court, to wit: "If the jury are reasonably satisfied from the evidence that at the time defendant did the acts which he did do in shooting and killing and in connection with the shooting and killing of Walter French, that his mind was diseased from alcoholism to the extent of rendering him wholly or partly insane, and to such extent as that he was incapable of committing mentally voluntary or intentional homicide, then he cannot be convicted of any offense higher than manslaughter in the second degree." We are not interested in a critical analysis or an academic discussion of the above and similar charges. Suffice it to say that, since the case of Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193, the law of insanity, as applied to crime, has been perfectly clear and would receive no additional clarity by incorporating a further discussion into the body of our decisions. The trial court, taking as a guide the decision in the Parsons Case, clearly and elaborately defined insanity as a defense to crime. If, therefore, the charge requested and refused is in conflict with the court's oral charge, the written requested charge was erroneous. If, on the other hand, the charge was not in conflict, then it is fully covered. If, we may add, the defendant is legally insane, as defined by our decisions, and the act was the result of such mental condition, he could not be convicted of any crime.

The appellant contends that the trial court erred to a reversal in what here follows:

"Counsel for defendant then asked the witness this question:

" 'Doctor, if it is true that the defendant is now between sixty-four and sixty-five years of age, and if there is thirty-one years, difference between his age and his present wife's age, and if they have been married for about fourteen years, a sufficient length of time to have a child now about thirteen years of age, and they have lived the usual relations between husband and wife for that period of

time, is it or not a fact that the effect of the marital relations between a man and his wife, when the man is so situated, who also is an habitue of drink, does not that relationship constitute a drain upon the nervous system in such a way as to add to the evil effects of whisky?'

"The state objected to the question. The court sustained the objection, and to its action in so doing, defendant duly and legally excepted.

"Counsel for defendant then asked the witness this question:

"'And will a man in that condition, under those circumstances, degenerate more rapidly under the influence of whisky than he would otherwise?'

"The state objected to the question; the court sustained the objection, and to its action in so doing, defendant duly and legally excepted.

"Counsel for defendant then stated to the court that the witness, if permitted to do so, would answer these questions in the affirmative.

"Counsel for defendant then asked the witness this question:

"'And is it not a fact, known to your science, that if there is a drink habit in the life of the old man that he hastens the destruction of mind and body by living in the marital relation with a young and vigorous woman?'

"The state objected to the question. The court sustained the objection, and to its action in so doing, defendant duly and legally excepted.

"The defendant then offered to prove, in this connection, that the wife is about thirty-one years younger than the husband, and that she is a vigorous woman within the bearing age; that she has a woman's nubility, is young, healthy and vigorous, and that the marital relation, under such circumstances, hastens the death of a man and weakens his powers.

"The state objected to the proof thus offered to be made, the court sustained the objection and expressly directed the jury that it was not testimony and was not for their consideration; to which ruling of the court defendant duly and legally excepted."

█ Counsel cites no authority sustaining the above contention, but relies on logic and what he claims is common knowledge. There is no such common knowledge as claimed by appellant. On the contrary, the usual relations between husband and wife are conducive to normalcy, rather than insanity. Such is the rule laid down in Herzog Med. Jur. 559. Says this writer: "Natural gratification of sex want being necessary for an absolutely healthy state of mind and body, * * * unrecognized sex starvation simulates organic disease, especially in females, although not infrequently in males. After the age of puberty no distinction is made and the natural coitus between male and female produces no evil effect on the physical or mental and the fact that the male is thirty years the senior of the female does not change the rule. Insanity being an abnormal condition of the mind, it is the unnatural and abnormal acts of the defendant which tend to prove insanity at the time of the crime which are admissible in evidence and the normal and natural acts are admissible to prove sanity. Insanity itself is a condition and not a thing and is not therefore susceptible of the usual means of proof, therefore the evidence must take a wide range for which no ironclad rule can be laid down, but any hypothetical question is objectionable where it assumes a statement of facts on which no medical or expert opinion should be based." Smoot Law of Insanity 511, par. 571.

Taking this entire record, which we have read and re-read, the conclusion reached by the court is that, if minor errors exist, they were not such as to injuriously affect defendant's rights. The defendant has had what appears to be a fair and an impartial trial according to the forms of law, and the application for rehearing is overruled.

Opinion extended. Application overruled.